1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| **TOULU THAO,** | ) | **1:11-cv-0799 AWI BAM** |
| | ) | |
| **Plaintiff,** | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER ON** |
| **v.** | ) | **DEFENDANTS' MOTION FOR** |
| | ) | **PARTIAL DISMISSAL OF** |
| **SHAUN DONOVAN, SECRETARY OF** | ) | **PLAINTIFF'S FIRST** |
| **THE DEPARTMENT OF HOUSING** | ) | **AMENDED COMPLAINT** |
| **AND URBAN DEVELOPMENT;** | ) | |
| **FORMER REGIONAL COUNSEL OF** | ) | |
| **HUD REGION IX FAYE AUSTIN;** | ) | |
| **FORMER FIELD DIRECTOR OF THE** | ) | |
| **FRESNO HUD OFFICE MARIE** | ) | |
| **SUDDUTH; TERESA CARSON,** | ) | |
| **FORMER AGENT OF THE U.S.** | ) | |
| **DEPARTMENT OF HOUSING AND** | ) | **Doc. # 26** |
| **URBAN DEVELOPMENT, HUD** | ) | |
| **OFFICE OF THE INSPECTOR** | ) | |
| **GENERAL; IN THEIR INDIVIDUAL** | ) | |
| **AND/OR OFFICIAL CAPACITIES** | ) | |
| **AND THE UNITED STATES OF** | ) | |
| **AMERICA; AND DOES 1-75,** | ) | |
| **INCLUSIVE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

23   This is a civil rights action by plaintiff Toulu Thao ("Plaintiff") against various persons

24   having present or past supervisory or investigatory responsibility in the Department of Housing

25   and Urban Development("HUD") in their personal and official capacities and the United States

26   of America (collectively, "Defendants").  Broadly, the claims alleged in Plaintiff's First

27   Amended Complaint ("FAC") arise from two sets of allegations; the first set alleges workplace

28   discrimination and discriminatory employment practices, and the second set alleges Defendants

knowingly presented false information to a grand jury for purpose of seeking the unlawful

criminal prosecution of Plaintiff.  Plaintiff's claims for relief are alleged pursuant to Title VII of

the Civil Rights Act, <u>Bivins v. Six Unknown Agents</u>, 403 U.S. 388 (1971) and the Federal Tort

Claims Act.  In the instant motion to dismiss, Defendants seek dismissal of Plaintiff's <u>Bivins</u> and

Tort Claims Act claims.  Federal question jurisdiction exists pursuant to 28 U.S.C. § 1331.

Venue is proper in this court.

**FACTUAL ALLEGATIONS**

Plaintiff was born in Laos and moved to Fresno, California in 1983.  In 1996, Plaintiff

formed a non-profit organization called Hmong American Community, an organization to

promote Hmong economic development.  Hmong American Community is often referred to as

"HAC".  Plaintiff began employment with HUD in 1998.  Approximately one week after

commencing employment as a Community Builder Fellow, Plaintiff was instructed by Defendant

Austin to complete a Confidential Financial Disclosure Report (OGE 450).  At the time of

Plaintiff's employment and until April of 2004, Defendant Sudduth was the Field Office Director

of the Fresno HUD office.  On or about May 2001, Sudduth "caused an investigation to be

commenced by the Office of the Inspector General by alleging that Hmong American

Community received a grant from HUD and that Plaintiff had failed to report [receiving HUD

grant money] in the Government Ethics Form, OGE Form 450."  Doc. 20 at ¶ 20.  The principal

participants in the investigation were Defendants Sudduth, Austin and Carson.

Plaintiff alleges that in 2004 Sudduth admitted to Carson that Sudduth was wrong in the

allegation that the Hmong American Community had received a HUD grant; rather, the

organization that had received the grant was Housing Assistance Corporation, an organization

that was also frequently referred to by the acronym "HAC," and an organization that had no

connection to Plaintiff.  Despite knowing, or having reason to know, that Plaintiff had not falsely

reported that he received no grant money from HUD, Defendant Carson falsely testified "to a

Federal Grand Jury that indicted Plaintiff in February 2006 and continued to conceal

2

1  [exonerating] information from federal prosecutors."  Doc. # 20 at ¶ 23.  Plaintiff alleges that

2  Defendant Austin acquiesced in the false testimony and the concealment of exonerating

3  information from federal prosecutors.

4         Plaintiff alleges that Defendants knew or had reason to know the falsity of the criminal

5  allegations not later than 2004 but persisted in support of Plaintiff's prosecution nevertheless.

6  Plaintiff also alleges that no other individual person employed by HUD has ever been criminally

7  charged for failure to report required information on the OGE Form 450 or any supplements

8  thereto.  Plaintiff alleges that although he disputes that his position even required the completion

9  of a OGE Form 450, he completed the form correctly according to instructions provided by

10 HUD.

11        On February 10, 2006, Plaintiff was arrested pursuant to a federal warrant at the Fresno

12 HUD office.  As of March 10, 2006, he was placed on indefinite suspension from his position at

13 HUD pending the outcome of the criminal prosecution.  Plaintiff alleges that in 2008 the Office

14 of the Inspector Genera ("OIG"), the agency responsible for the investigation of Plaintiff's

15 criminal charges and for providing information to the parties in the criminal action, "received

16 numerous confirmations from HUD that the Hmong American Community had not received a

17 grant from HUD, yet did not take appropriate action to terminate the criminal proceeding in light

18 of [Plaintiff's] actual innocence.  Doc. # 20 at ¶ 28.

19        On July 3, 2008, Plaintiff entered into a "Deferred Prosecution Agreement" (hereinafter,

20 the "Agreement").  There is some disagreement between the parties as to what conduct Plaintiff

21 did or did not acknowledge in the agreement, and whether the conduct that was admitted

22 constituted an admission of wrongdoing.  However, it appears uncontested that under the

23 agreement the government agreed to not take action in furtherance of the criminal action and

24 agreed to dismiss the indictment at the end of twelve months provided Plaintiff refrained from

25 any unlawful activity and performed a period of community service.

26        On July 15, 2008, approximately two weeks after the Agreement had been executed, the

27

28                                              3

U.S. Attorney produced to Plaintiff's attorney discovery materials that included, *inter alia*, an e-mail exchange between Defendants Sudduth and Carson wherein Sudduth sent Carson an e-mail on February 25, 2004, "falsely stating that Hmong American Community, with whom Plaintiff had a relationship, had received HUD funding." Doc. # 20 at ¶.  On the following day Sudduth sent Carson a second e-mail stating that the prior e-mail had been in error and the Hmong American Community had *not* received HUD funding.  No explanation was provided as to why the e-mail exchange showing Defendants' knowledge of the falsity of the criminal charges was not provided prior to the time the Agreement was executed.

In July 2009, about one year after the Agreement was executed, all charges against Plaintiff were dismissed in accord with the terms of the Agreement.  Although the dismissal of the charges coincided with the time-frame specified for dismissal of the charged in the Agreement, Plaintiff alleges he was factually innocent of the charges alleged from the outset.

Plaintiff's complaint alleges a number of facts pertaining to an Equal Employment Opportunity Commission ("EEOC") complaint that was filed by Plaintiff following his reinstatement and was denied by EEOC.  Plaintiff's first claim for relief seeks judicial review of the EEOC's finding of no employment discrimination; however, Defendants do not challenge Plaintiff's first claim for relief in the instant motion to dismiss.  The court will therefor not reiterate the facts alleged with regard to that claim.

**LEGAL STANDARD**

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure can be based on the failure to allege a cognizable legal theory or the failure to allege sufficient facts under a cognizable legal theory.  Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-34 (9th Cir.1984).  To withstand a motion to dismiss pursuant to Rule 12(b)(6), a complaint must set forth factual allegations sufficient "to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("Twombly").  While a court considering a motion to dismiss must accept as true the allegations of the complaint in question,

Hospital Bldg. Co. v. Rex Hospital Trustees, 425 U.S. 738, 740 (1976), and must construe the

pleading in the light most favorable to the party opposing the motion, and resolve factual

disputes in the pleader's favor, Jenkins v. McKeithen, 395 U.S. 411, 421, reh'g denied, 396 U.S.

869 (1969), the allegations must be factual in nature.  See Twombly, 550 U.S. at 555 ("a

plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than

labels and conclusions, and a formulaic recitation of the elements of a cause of action will not

do").  The pleading standard set by Rule 8 of the Federal Rules of Civil Procedure "does not

require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-

unlawfully-harmed-me accusation."  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) ("Iqbal").

The Ninth Circuit follows the methodological approach set forth in Iqbal for the

assessment of a plaintiff's complaint:

> "[A] court considering a motion to dismiss can choose to begin by identifying
> pleadings that, because they are no more than conclusions, are not entitled to the
> assumption of truth.  While legal conclusions can provide the framework of a
> complaint, they must be supported by factual allegations.  When there are well-
> pleaded factual allegations, a court should assume their veracity and then
> determine whether they plausibly give rise to an entitlement to relief."

Moss v. U.S. Secret Service, 572 F.3d 962, 970 (9th Cir. 2009) (quoting Iqbal, 129 S.Ct. at

1950).

## DISCUSSION

Defendants have moved to dismiss Plaintiff's second and third claims for relief only.  The

graveman of these claims for relief is that Defendants' conduct amounted to malicious

prosecution when Defendants knowingly provided incriminatory evidence they knew at the time

to be false to the OIG and when they actively withheld evidence that was known to be

exculpatory over the term of the criminal proceeding.  Rule 8(d)(2) of the Federal Rules of Civil

Procedure establishes the general rule that a plaintiff may plead alternative theories of recovery

that arise from the same set of facts.  This is precisely what Plaintiff's FAC does.  If Plaintiff can

prove that he suffered malicious prosecution as a result of employment discrimination, then he

may be entitled to relief under his first claim for relief pursuant to Title VII.  See Berry v.

5

Stevinson Chevrolet, 74 F.3d 980, 986 (10th Cir. 1996) (malicious prosecution may be an adverse job action for purposes of Title VII).  If Plaintiff cannot prove the alleged malicious prosecution was rooted in discriminatory animus, he may nonetheless be entitled to relief under his second claim for relief under Bivins if he can show he was prosecuted with malice, without probable cause and for the purpose of denying Plaintiff "equal protection or some other specific constitutional right."  Freeman v. City of Santa Ana, 68 F.3d 1180, 1189 (9th Cir. 1995).  Should Plaintiff be unable to prove malicious prosecution arising from discrimination or for the purpose of depriving him of equal protection or some other constitutional right, he may yet seek relief by way of his third claim for relief which alleges the tort of malicious prosecution under the Federal Tort Claims Act.

As Defendants' arguments in support of their motion to dismiss suggest, the general rule permitting pleading of alternative legal theories of recovery may be tempered by preemption or other preclusive doctrine where Congress has seen fit to provide a single remedy to the exclusion of others for certain kinds of claims.  Specifically, Defendants contend that both Title VII and the Civil Service Reform Act ("CSRA") limit Plaintiff's ability to plead alternative theories for relief based on the allegation of malicious prosecution arising out of his federal employment.  The court will consider the preclusive effect of Title VII and the CSRA in turn.

**I.  Title VII**

It is clear that Defendants' argument with respect to the preclusive effect of Title VII is out of place here.  Defendants argue that "Title VII creates 'an exclusive, preemptive administrative and judicial scheme for the redress of federal employment discrimination' based on race, color, religion, sex, or national origin."  Doc. # 26-1 at 6:14-16 (quoting Brown v. General Services Administration, 425 U.S. 820, 825 (1976).  Presuming the validity of Defendants' contention, the court notes that the issue it addresses is not presently before the court.  The question presented by Defendants' motion to dismiss is not whether Plaintiff can *recover* on a Bivins or Tort Claim Act claim where he is able to prove discriminatory animus was

at the root of the alleged malicious prosecution, it is whether Plaintiff may *plead* other theories to cover the eventuality he cannot prove discrimination was involved.  See <u>White v. Gen. Servs. Admin.</u> 652 F.2d 913, 916 (9 Cir. 1981) ("It is true that Title VII does not preclude separate remedies for unconstitutional action other than discrimination based on race, sex, religion or national origin")  Defendants have neither argued or presented authority for the proposition that Plaintiff is precluded by Title VII from asserting claims based on malicious prosecution that are not based on discrimination.  The court therefore finds that Title VII does not preclude Plaintiff's pleadings in the alternative that he suffered malicious prosecution other than as a result of unlawful discrimination.

## II.  CSRA

With regard to CSRA the analysis is somewhat more complex.  Defendants contend that CSRA has preclusive effect on both Plaintiff's <u>Bivins</u> claim and his claim under the Federal Tort Claim Act ("FTCA").  Although the analysis of preclusive effect ultimately focuses on the same set of facts and factual characterizations, the legal framework for the analysis is different as between the two theories of relief.  The court addresses CSRA's preclusive effect on Plaintiff's <u>Bivins</u> claim first.

### A.  CSRA Does Not Preclude *Bivins* Claim

In <u>Bivins v. Six Unknown Named Agents of the Fed. Narcotics Bureau</u>, 403 U.S. 388 (1971) the Supreme Court recognized a cause of action against federal actors for constitutional torts that is analogous to a cause of action under 42 U.S.C. § 1983.

> In <u>Bivins</u> the Court held that federal officers who acted under color of law were liable for damages caused by their violation of the plaintiff's Fourth Amendment rights. [Bivins] 403 U.S. at 389 [. . . .] Finding "no special factors counseling hesitation in the absence of affirmative action by Congress," the Court applied the rule that "where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, courts may use any available remedy to make good the wrong done."  <u>Id.</u> at 369.

<u>Saul v. United States</u>, 928 F.2d 829, 835-836 (9th Cir. 1991).

In <u>Bush v. Lucas</u>, 462 U.S. 367 (1983) the Supreme Court considered whether a federal

employee's claim of First Amendment violation arising as a result of retaliatory job actions taken by his employer were actionable under Bivins.  As the Bush Court noted, "a Bivins action could be defeated in two situations [. . . .] First, the Court could discern 'no special factors counseling hesitation in the absence of affirmative action by Congress.' [. . . .] Second, there was no congressional determination foreclosing the damages claim and making the Federal Tort Claims Act exclusive.' [Citations.]" Id. at 377-378 (internal citations to Bivins omitted).  The Bush Court reached the conclusion that, where a federal employee suffers demotion or loss of pay in retaliation for the employee's exercise of First Amendment rights, the CSRA is a "special factor" counseling the courts to decline to create a judicial remedy under Bivins.  Bush, 462 U.S. at 398-390.  The Bush court explained the preclusive effect of the CRSA by reasoning that where a federal employee is improperly disciplined for the exercise of his First Amendment rights, he may not recover damages under a Bivins action because "such claims arise out of an employment relationship that is governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States."  Bush, 462 U.S. at 368 (referring to CSRA). The Court concluded that where such "comprehensive procedures" exist, "it would be inappropriate for [courts] to supplement that regulatory scheme with a new judicial remedy."  Id.

A good deal of the case authority examining the preclusive scope of the CRSA has focused on the tension between "comprehensive procedural and substantive provisions" and "meaningful remedies."  While some jurisdictions have focused their analysis on what constitutes "meaningful remedy," see Spagnola v. Mathis, 809 F.2d 16, 37 (D.C. Cir. 1986) (Silberman, J, noting in dissent the majority's focus on remedies provided), the Ninth Circuit has rejected the "meaningful remedies" analysis in favor of a determination of whether Congress intended the CRSA to encompass the personnel action suffered by the employee whether or not a remedy was available.  Saul, 928 F.2d at 837; see also, Stewart v. Evans, 275 F.3d 1126, 1130 (D.C. Cir. 2002) (noting disagreement between the D.C. Circuit and the decision Saul).  However, Plaintiff's argument against the preclusive effect of CRSA avoids any concern of the adequacy of

available remedies or the intent of Congress to incorporate the constitutional harm within the ambit of the CSRA; rather it focuses on the question of whether malicious criminal prosecution is within the realm of "personnel actions" within the meaning of the CSRA.

As was previously pointed out, a claim of malicious prosecution, if engendered by prohibited discriminatory animus, may be an "adverse employment action" for purposes of Title VII.  However, Congress chose a different term – "personnel action" – to describe the scope of activities that come within the ambit of the CSRA and the court cannot assume the two terms mean the same thing.  Thus, in the factual context of this action – that of an action based principally on the allegation of malicious prosecution – the court must focus on the crucial distinction between what may be considered an "adverse employment action" within the meaning of Title VII and what may be considered a prohibited "personnel action" within the meaning of the  CRSA.  The Saul court examined the issue to a limited extent by concluding that, while the CSRA defined "personnel action" so as to incorporate any "'disciplinary or corrective action,'" Saul, 928 F.2d at 833, it was not the intent of congress to confine the scope of "personnel actions" so narrowly as to exclude actions having no effect on pay or rank.  Rather, the Saul court concluded the scope of employer "personnel actions" by the the CSRA was broad enough to the allegation of "supervisors' violations of employees' constitutional and privacy rights."  Id. at 834.  The Saul court stopped short of announcing any criteria for determining which constitutional violations should be included or excluded from the CSRA and held only that the term "'corrective action' in [5 U.S.C. ] section 2302 can be read broadly enough to encompass the mail opening [by a supervisor] before us."  Id.

The issue the Saul court left largely unaddressed – what considerations are relevant in the determination of what is or is not a "personnel action" – was addressed more thoroughly in Collins v. Bender, 195 F.3d 1076 (9th Cir. 1999).  Both the Collins court and the Saul court addressed facts giving rise to allegations of Fourth Amendment violation by supervisory officers of federal agencies.  Factually, what differentiated the two cases is that in Saul the alleged

9

1   infringement occurred when a supervisor seized and opened mail that was addressed to the

2   plaintiff at work, <u>Saul</u>, 928 F.2d at 831, whereas in <u>Collins</u>, the alleged Fourth Amendment

3   infringement occurred at the plaintiff's home when personnel from the agency entered the

4   plaintiff's home without a warrant and seized firearms belonging to the plaintiff.  <u>Collins</u>, 195

5   F.3d at 1077.  While the <u>Collins</u> court held that the location of the alleged infringement was a

6   factor for consideration, it was not determinative.  <u>Id.</u> at 1079.  Rather, what the <u>Collins</u> court

7   focused on was the degree to which the complained-of action was connected with, or merely

8   tangential to, the plaintiff's employment.  <u>See id.</u> ("Any connection between the defendants'

9   search and [the plaintiff's] employment was, at best, attenuated.").

10          Applying the principles in <u>Collins</u>, the court finds that the allegation of malicious

11  criminal prosecution lies outside what Congress meant by the term "personnel action."  Two

12  lines of reasoning lead to this conclusion.  First, the connection between Plaintiff's prosecution

13  for omitting information from his OGE Form 450 and his job is closer to happenstance than a

14  personnel action arising from employment.  There are any number of forms which, when

15  completed and submitted to an agency of the federal government, carry the potential for criminal

16  sanction if they contain false omissions or false information.  Tax information forms are but one

17  example.  Plaintiff was subject to prosecution because he was accused of omitting information

18  from a form that carried the potential of penalty for perjury, not because of his actions as a HUD

19  employee or because he actually exhibited any indication of being improperly influenced on the

20  job.  Second, and more compelling, the actual damage inflicted against Plaintiff was the result of

21  actions by an agency entirely separate from Plaintiff's employment.  At minimum, the authority

22  cited by the parties and reviewed by the court indicates that a "personnel action" must refer to an

23  act carried out by the *employer* that results in a constitutional harm.  Had officials from the

24  Justice Department declined to take any action, Plaintiff would have been entirely unaffected by

25  Defendants' actions.  Put another way, HUD is not capable within its own organization of

26  committing malicious prosecution because it cannot prosecute; it must have recruited an outside

27

28                                                  10

1    agency to accomplish the harm Plaintiff alleges.  The court can find no support for the

2    proposition that constitutional harms that are realized only as a consequence of involvement by

3    an agency that is outside the control of the employer qualifies as a "personnel action."

4          Defendants rely heavily on the decision in <u>Saul</u> in characterizing their actions as being

5    related to "corrective action" and therefore within the general ambit of "personnel actions" that

6    are precluded by CSRA.  The court, for the reasons stated above, rejects Defendants'

7    characterization of their actions.  The complaint does not allege that Defendants confronted

8    Plaintiff regarding the information contained in the OGE Form 450, or that *they* took any action

9    directly against Plaintiff.  Rather, the complaint alleges that Defendants gave perjured testimony

10   to an *outside* agency for the purpose of obtaining a criminal conviction.  While it is not the

11   purpose of this court to construct rules applicable to anything other than the case at hand, it is

12   difficult to imagine a set of facts where it would be reasonable to conclude that the allegation of

13   malicious prosecution was a "personnel action" within the meaning of the CSRA.  Certainly, no

14   such facts are present here.

15   **III.  Plaintiff's FTCA Claim**

16          ***A.  Preclusion Under Title VII or CSRA***

17          Plaintiff's third claim for relief alleges "Claim under the Federal Tort Claims Act for

18   Arrest without Probable Cause, Malicious Prosecution, and Fabrication of Evidence."

19   Defendants contend Plaintiff's third claim for relief under the FTCA is precluded by Title VII

20   and the CSRA.  The court briefly reiterates its conclusions with regard to the preclusive effects of

21   Title VII and CSRA.   Title VII precludes Plaintiff's claim for malicious prosecution only if it is

22   shown that the malicious prosecution was the result of prohibited racial or ethnic animus.  As

23   previously noted, there is nothing about the constitutional or civil tort of malicious prosecution

24   that necessarily implies discriminatory intent.  That being the case, the court reiterates its

25   conclusion that Title VII does not preclude Plaintiff from alleging in the alternative that he

26   suffered the civil tort of malicious prosecution unrelated to racial or ethnic discrimination.

27

28                                                 11

1   Similarly, the court, having found that the CSRA does not bar Plaintiff's Bivins claim because

2   the action complained of – malicious prosecution – is not a "personnel action" within the

3   meaning of the CSRA, finds that the CSRA does not preclude Plaintiff's civil tort claim for

4   malicious prosecution for the same reason.

5          **B.  False Arrest**

6          Defendants also contend Plaintiff's FTCA claim is untimely as to claim for false arrest.

7   Plaintiff, in his opposition, contends that the facts alleged in the complaint "are part of a single

8   malicious prosecution conspiracy, and that the false arrest and other indignities are simply

9   damages flowing from that single conspiracy."  Doc. # 32-1 at 28:1-4.  The court finds Plaintiff's

10  contention ambiguous.  To the extent it is Plaintiff's contention that his "false" arrest is simply a

11  *fact*, relevant perhaps to damages, the court agrees.  However, to the extent it is Plaintiff's

12  contention that there is a separate *claim* that arises out of his arrest for the separate tort of false

13  arrest, the court must point out that a claim for false arrest cannot be supported on the facts

14  alleged.  Plaintiff's complaint alleges he was arrested on February 13, 2006, at gunpoint by five

15  United States Marshals.  The court infers from the other facts pled in the complaint that the arrest

16  was pursuant by an indictment by a grand jury.  Time limits notwithstanding, Plaintiff's arrest

17  cannot be considered "false" because it was accomplished under legal authority and in

18  conformity with the required legal formalities.  See Blaxland v. Commonwealth Director of

19  Public Prosecutions, 323 F.3d 1198, 1204-1205 (9th Cir. 2003) (explaining that false arrest is

20  confinement without lawful privilege whereas malicious prosecution is a unlawful abuse of the

21  legal process of criminal prosecution); see also, Randle v. City & County of San Francisco, 186

22  Cal.App.3d 449 (1986) ("False arrest or imprisonment and malicious prosecution are mutually

23  inconsistent concepts, the former relating to conduct that is without valid legal authority and the

24  latter to conduct where there is valid process or due authority.").

25         One who institutes criminal proceedings against another intends to cause an arrest
           which is the normal incident of such proceedings.  In such case, however, the
26         actor is liable only if the confinement which the arrest involves is a part of the
           greater offense of instituting such proceedings without reasonable cause and for a

27

28                                              12

1   purpose other than that for which the proceedings are provided.

2   Restatement (Second) of Torts § 37 cmt. b.  The court interprets Plaintiff's third claim for relief

3   as being consistent with the foregoing and will therefore not strike or dismiss claims it finds are

4   not present.  However, Plaintiff is advised that, so far as the court is concerned, no separate claim

5   for false arrest has been or can be stated.

6   ### *C. Third Claim For Relief Sufficiently Alleged*

7        To allege a claim for malicious prosecution of either a criminal or civil proceeding under

8   California common law, a plaintiff must "demonstrate 'that the prior action (1) was commenced

9   by or at the direction of the defendant and was pursued to a legal termination in [plaintiff's] favor

10  [citations]; (2) was brought without probable cause [citations]; and (3) was initiated with malice

11  [citations].' [Citation]." JSJ Ltd. Partnership v. Mehrban, 205 Cal.App.4th 1512, 1523 (2 Dist.

12  2012) (quoting Casa Herra, Inc. v. Beydoun, 32 Cal.4th 336, 341 (2004)).  Defendants contend

13  that Plaintiff's FAC fails to state a tort claim for malicious prosecution because Plaintiff cannot

14  show that the prior action – Plaintiff's criminal prosecution – terminated in Plaintiff's favor.

15      The first element of a malicious prosecution cause of action is that the underlying
        case must have been terminated in favor of the malicious prosecution plaintiff.
16      The basis of the favorable termination element is that the resolution of the
        underlying case must have tended to indicate the malicious prosecution plaintiff's
17      innocence.  When prior proceedings are terminated by means other than a trial, the
        termination must reflect on the merits of the case and the malicious prosecution
18      plaintiff's innocence of the misconduct alleged in the underlying lawsuit.

19  JSJ Ltd. Partnership, 205 Cal.App.4th at 1523-1524 (internal quotes and citations omitted).

20      Defendants' argument suggests two lines of reasoning to support the contention that

21  Plaintiff's FAC does not allege a claim for the tort of malicious prosecution.  First, Defendants'

22  argument suggests that Plaintiff acknowledged his non-innocence by entering into the Agreement

23  which, by its own terms, required Plaintiff to admit culpability.  Second, Defendants contend that

24  the nature of the settlement of the criminal case was such that it does not establish Plaintiff's

25  innocence and that it therefore did not conclude in Plaintiff's favor for purposes of fulfilling the

26  first element.

27

28                                              13

With regard to any suggestion that Plaintiff's entry into the Agreement constitutes an admission of guilt, the court agrees with Plaintiff that the Agreement does not suggest any acknowledgment of culpable behavior.  Defendants note that the Agreement was offered in consideration of the fact that Plaintiff "acknowledge responsibility for his actions and [. . .] demonstrate his future good conduct."  Doc. # 26-2 at ¶2.  Further, the Agreement required that Plaintiff "comply with all federal, state, and local laws, and [. . .] complete 200 hours of community service."  Doc. # 26-2 at ¶3.  Of some significance, the parties to the Agreement stipulated as to the facts that were admitted as follows:

> On or about November 1, 2001, [Plaintiff] completed an Office of Government Ethics for (OGE Form 450.  On that OGE Form 450, [Plaintiff] did not report that he had received approximately $5,200 from the Hmong Economic Development Corporation [sic], consisting of a check in the amount of $2,000 on or about August 6, 2001, and a check in the amount of $3,200 on or about December 10, 2000.
>
> On or about November 1, 2001, [Plaintiff] also did not report on the OGE Form 450 that his son Victor Thao had received checks from Hmong Economic Development Community in excess of $7,500.  At least $5,000 of this amount was then used by [Plaintiff] to pay one or more checks to [Plaintiff's] credit card company.

Doc. # 26-2 at ¶8. Also significantly, the facts admitted portion of the Agreement stipulated that "[t]he parties specifically disagree what [Plaintiff's] intent was with respect to his not reporting the payments identified above, as well as the consequences triggered thereby." Id.

The court concludes that the Agreement rather pointedly avoided any admission of culpable behavior on Plaintiff's part.  In view of Plaintiff's allegations of what he knew and what Defendant's knew but did not disclose, the facts admitted in the Agreement support only the proposition that Plaintiff filled out the OGE Form 450 as alleged and that he disagreed with the indictment that he had received the moneys alleged or that he was obliged to report anything other than what he had reported.  As stated, the court finds no admission of wrongdoing contained in the Agreement or in the motion to dismiss the criminal proceeding.

With regard to Defendants' second contention – that Plaintiff cannot allege a common law tort claim for malicious prosecution because there is nothing about the conclusion of the

14

1  criminal action that affirmatively indicates Plaintiff's innocence – the matter is a good deal more

2  complex.

3      While the Agreement carries no implications with regard to Plaintiff's guilt or culpability,

4  neither does it appear to provide any support for Plaintiff's factual innocence.  The Agreement

5  does, by its own terms, constitute a bar to subsequent prosecution of the same action, however it

6  is not at all clear that the bar can be considered the result of a favorable termination of malicious

7  prosecution.  "A technical or procedural [termination] as distinguished form a substantive

8  termination is not favorable for purposes of a malicious prosecution claim.  Examples include

9  dismissals (1) on statute of limitations grounds; (2) pursuant to a settlement; or (3) on the

10  grounds of laches. [Citation.]" Id. at 1525 (quoting Casa Herrera, Inc. v. Beydoun, 32 Cal.4th

11  336, 342 (2004) (internal citations and quotes omitted)).  In the context of the instant action, the

12  Agreement most closely resembles a settlement which is absolutely neutral with regard to any

13  indication of Plaintiff's guilt or innocence.  As such, the Agreement cannot, by itself, support the

14  proposition that the criminal action terminated favorably for Plaintiff.

15      The question that next arises is whether there are other factors from which a court may

16  conclude that Plaintiff's criminal proceeding terminated favorably to Plaintiff or whether the

17  facts of this particular action create an exception to the requirement that Plaintiff show

18  termination of the criminal action on terms favorable to himself.  See Sycamore Ridge

19  Apartments LLC v. Naumann, 157 Cal.App.4th 1385, 1399 (2007) (where information

20  surrounding termination is conflicted regarding guilt or innocence "the determination of the

21  reasons underlying the dismissal is a question of fact");   see also Daniels v. Robbins, 182

22  Cal.App.4th 204, 217-218 (2010) (discussing facts attendant to dismissal that may indicate

23  favorable dismissal in prior action).

24      Malicious prosecution has traditionally been regarded as a disfavored cause of action

25  because of its "potential to impose an undue 'chilling effect' in the ordinary citizen's willingness

26  to report criminal conduct or to bring a civil dispute to court."  Sheldon Appel Co. v. Albert &

27

28                                          15

1  Oliker, 47 Cal.3d 863, 872 (1989); see also Downey Venture v. LMI Ins. Co., 66 Cal.App.4th

2  478, 493 (1998) (malicious prosecution disfavored because public favors "open access to courts

3  for the redress of grievances."). The public policy reflection of the disapproval of malicious

4  prosecution claims is reflected in California Code of Civil Procedure section 425.16 which places

5  on the plaintiff the burden of showing the probability of success on the merits of his suit once it

6  is established that the challenged action arose from a protected activity, such as the right of

7  petition or of free speech. Daniels, 182 Cal.App.4th at 214 - 215. Pursuant to section 425.16 an

8  action for malicious prosecution or abuse of process is subject to a special motion to strike the

9  complaint ("anti-SLAPP motion")[1] if the plaintiff cannot satisfy the requirement of probability of

10  success.

11      In the realm of anti-SLAPP jurisprudence, if the plaintiff in the underlying action secures

12  a favorable outcome, even if that outcome is later overturned on appeal, courts will conclusively

13  presume there was probable cause to bring the prior action and will therefore strike the

14  subsequent malicious prosecution claim pursuant to section 425.16. See Plumley v. Mockett,

15  164 Cal.App.4th 1031, 1052 (2008). "This presumption – referred to by some authorities as the

16  'interim adverse judgment' rule – is subject to an exception where the underlying victory was

17  obtained by fraud or perjury." Id. at 1053. While courts disfavor malicious prosecution causes

18  of action, it has been long recognized that "if a man has procured an unjust judgment by the

19  knowing use of false and purjured testimony, he has perpetrated a great private wrong against his

20  adversary. . . . So we find it laid down that the general rule now is, 'that if the declaration or

21  complaint shows a conviction of the plaintiff, yet it be averred that the conviction was procured

22  by fraud, perjury or subornation of perjury, or other unfair conduct on the part of the defendant,

23

24          [1]    The subject of motions pursuant to section 425.16 are referred to as "Strategic Suits to Limit Public

25  Participation" or more commonly as "SLAPP suits." A motion pursuant to section 425.16 is therefore commonly
    referred to as an "anti-SLAPP motion." Because essentially all lawsuits or criminal prosecutions arise from an

26  activity that is privileged under the First Amendment right to petition for the redress of grievances, essentially all
    actions for malicious prosecution are SLAPP suits. Plaintiffs bringing malicious prosecution suits under California

27  common law are therefore subject to the special evidentiary burdens imposed by section 425.16.

28                                          16

the presumption of probable cause is effectually rebutted.' [Citations.]" <u>Carpenter v. Sibley</u>, 153 Cal. 215, 218 (1908).  The court in <u>Plumley</u> further clarified the fraud exception to the interim adverse judgment rule by holding that the exception only applies where the fraud or perjured testimony is relied upon by the trier of fact to produce the adverse judgement.  <u>See</u> <u>Plumley</u>, 164 Cal.App.4th at 1056 ("where claims of fraud or perjury are litigated and rejected by a fact finder in an underlying case, those same claims cannot be relief on to establish the absence of probable cause in a subsequent malicious prosecution suit.").

The central factual allegation in Plaintiff's FAC is that Defendants caused the criminal case by presenting to the U.S. Attorney and to the Grand Jury information they knew to be false at the time.  The question then is what is the impact of this allegation under the facts of this case. Clearly, to the extent the Agreement could be construed as establishing probable cause for the prosecution based on the outcome of the Agreement, Plaintiff's allegation of perjured testimony and the evident reliance thereon by the Grand Jury and the U.S. Attorney is sufficient to negate any presumption of probable cause.  The question remains whether a proceeding that did not, in and of itself, conclude in a manner that tends to establish Plaintiff's innocence, may nevertheless be found to have concluded so as to fulfil the first element of the cause of action for malicious prosecution because it was commenced and prosecuted on the basis of perjured testimony.  The court finds it does.

Although the fraud/perjury exception to the interim adverse judgment rule is of considerable lineage, there are, perhaps reassuringly, few cases that interpret it.  <u>See</u> <u>id.</u> at 1053-1054 (reviewing cases where rule was not applied because there was no judicial reliance on fraudulent/perjured testimony).  Nevertheless, there is no indication that the public policy that holds prosecution on the basis of fraudulent or perjured testimony a "great private harm" is any less concerning today than it was when the exception was first formulated.  Where, as here, a plaintiff adequately states a factual basis for the allegation that both the institution and the prosecution of the underlying action were almost entirely predicated on knowingly false

17

testimony, the court finds that it would be perverse if the defendant were to find refuge from liability simply because of the technical neutrality of the ultimate disposition of the underlying action.  The court concludes that in this action, the allegation of facts adequate to support the claim that the underlying criminal action was both instituted and maintained in substantial reliance on fraudulent or perjured testimony both negates any implication of probable cause that may arise from the Agreement and serves to provide an indication of Plaintiff's innocence in the underlying criminal matter to satisfy the first element of a claim for malicious prosecution.

In accord with the foregoing analysis, it is hereby ORDERED that Defendants' motion for partial dismissal of Plaintiff's FAC is GRANTED only to the extent Plaintiff's second claim for relief may be interpreted as alleging a claim for False Arrest; otherwise, Defendants motion for dismissal of claims two and three is DENIED.

IT IS SO ORDERED.

Dated:   September 14, 2012

CHIEF UNITED STATES DISTRICT JUDGE